IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**STANLEY W. ROE,**               )
                                  )
       **Plaintiff,**           )
                                  )
vs.                               )   **Civil No.**  15-cv-229-CJP[1]
                                  )
**CAROLYN W. COLVIN,**            )
**Acting Commissioner of Social** )
**Security,**                     )
                                  )
       **Defendant.**           )

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Stanley Roe is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB).

## Procedural History

Plaintiff applied for benefits on December 22, 2011, alleging disability beginning on August 19, 2010. (Tr. 20). After holding an evidentiary hearing, ALJ William Mackowiak denied the application in a written decision dated October 15, 2013. (Tr. 20-29). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 10.

## Issues Raised by Plaintiff

Plaintiff raises the following point:

1. The ALJ erred in forming plaintiff's RFC by improperly rejecting the opinion of plaintiff's primary medical source.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is

2

> considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

**Weatherbee v. Astrue, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520; Simila v. Astrue, 573 F.3d 503, 512-513 (7th Cir. 2009); Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984). See also Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001)**(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant

reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See,** ***Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Mackowiak followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since his alleged onset date. He found that plaintiff had severe impairments of heart murmur, peripheral neuropathy, obesity, lumbar radicular pain, history of left rotator cuff tear, and history of carpal tunnel syndrome. The ALJ further determined these impairments do not meet or equal a listed impairment. (Tr. 22).

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary level, with physical and mental limitations. (Tr. 23). Based on the testimony of a vocational expert (VE), the ALJ found that plaintiff was not able to do his past work. (Tr. 27). However, he was not disabled because he was able to do other jobs which exist in significant numbers in the regional and national economies. (Tr. 28).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

Plaintiff was born on July 12, 1965, and was forty-five years old on the alleged onset date of August 19, 2010. He was insured for DIB through December 31, 2015. (Tr. 157-58, 191). He previously worked as a machine operator for an automotive company. (Tr. 136). He took amitriptyline for depression, fenofibrate for high cholesterol, Lisinopril and propranolol for high

blood pressure, Lyrica and Tylenol for pain, and vitamin B12 injections. (Tr. 168, 188).

Plaintiff submitted function reports in March and August 2012. (Tr. 144-54, 175-85). He stated that he could not walk very well due to numbness in his feet and pain in his hip and he could not hold small items because he had no control of his hands. (Tr. 144, 175). On a daily basis, he would wake up, eat breakfast, make a simple breakfast for his daughter, watch television, eat dinner, and go to bed. He lived with his wife, two daughters, and a dog. His wife and daughters took care of the dog (Tr. 145-176). He stated that it was difficult to get dressed, bathe, and shave. (Tr. 176).

Plaintiff could prepare simple meals like sandwiches and soup, and he was able to do light cleaning a few times a month. (Tr. 146, 177). He could drive and was able to handle finances. He occasionally shopped for groceries but his wife typically did the shopping for their household. (Tr. 147, 178). He claimed t have difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, climbing stairs, remembering, completing tasks, concentrating, and following instructions. He could walk about a block before needing to rest for fifteen to twenty minutes. (Tr. 149, 180). Plaintiff stated that prednisone caused boils, weight gain, and drowsiness. Lyrica also caused weight gain and drowsiness. (Tr. 151, 182).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on September 24, 2013. (Tr. 36). At the beginning of the hearing the ALJ noted

that plaintiff had a high school education, previously worked as a machine operator, and his major medical problems involved his spine, peripheral neuropathy, kidney stones, lumbar radiculopathy, a history of bilateral carpal tunnel syndrome, rotator cuff problems, and a heart murmur workup. (Tr. 37-38).

Plaintiff testified that in August 2010, prior to leaving work, he had weakness in his legs, stumbling, staggering, pain in his hips, and pain in his lower back. The pain in his lower extremities was constant and caused his legs to be constantly swollen. (Tr. 40). He would need to sit down and rest after fifteen or twenty minutes of being on his legs. (Tr. 41). He rated his pain as a ten out of ten, but his pain would improve after he sat down for fifteen or twenty minutes. (Tr. 41-42). His symptoms occasionally prevented him from sleeping well as his legs would cramp at night and he would have to walk around before he was able to go back to sleep. (Tr. 44).

He took six different medications on a daily basis but was not sure that any of his medications were overly helpful. (Tr. 42-43). He tried physical therapy and hydrocortisone injections to help with pain but they did not provide pain relief either. (Tr. 43). Plaintiff stated that his medications occasionally caused drowsiness that would require him to lie down for about an hour. He testified that he needed to lie down due to these side effects about fifteen to twenty days per month. (Tr. 44).

Plaintiff could mow his lawn on his riding lawn mower and could weed-eat his lawn but it took significantly longer than it did in the past. After fifteen to

7

thirty minutes of any activity he needed to sit and rest. (Tr. 45). He had a twenty-six year old daughter with Down syndrome that lived with him and his wife. (Tr. 46). Plaintiff fixed her lunch and cared for her daily. (Tr. 46-47). He stated that he could no longer go hunting and he found it difficult to focus on tasks. (Tr. 46).

A vocational expert (VE) also testified. (Tr. 50-56). The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform sedentary work limited to lifting up to ten pounds occasionally, standing and walking for two hours out of an eight hour day and sitting up to six hours out of an eight hour day. The person should never climb ladders, ropes, or scaffolding, and could occasionally climb stairs or ramps. (Tr. 52). Additionally, the person could occasionally balance, stoop, kneel, crouch, and crawl, and could frequently reach, handle, finger, and feel with the bilateral upper extremities. He should avoid concentrated exposure to hazards such as moving machinery, unprotected heights, and hazardous machinery. Finally, the person should be limited to work with simple, routine, and repetitive tasks. (Tr. 52-53).

The VE testified that the person could not perform any of plaintiff's previous work. However, he could do jobs that exist in significant numbers in the national economy. Examples of such jobs are document preparer, circuit board assembler, and surveillance system monitor. (Tr. 53-54). The VE testified that if the person was off task for more than fifteen percent of the workday all work would be precluded. (Tr. 54-55).

### 3. Medical Evidence

Plaintiff saw neurologist Anthony Collins in March 2010 complaining of paresthesias and cramping in his legs and feet. Dr. Collins ordered an MRI. (Tr. 201). The MRI showed scattered white matter in plaintiff's brain, which Dr. Collins found suspicious for multiple sclerosis (MS). (Tr. 201, 208, 219). Thereafter, plaintiff underwent nerve conduction testing for MS which came back negative. (Tr. 211). Additional MRIs of plaintiff's cervical, thoracic, and lumbar spine were taken and showed disc protrusions at T9-10, small central L5-S1 disc protrusion associated mild spinal stenosis and moderate bilateral foraminal narrowing. (Tr. 221-225).

Plaintiff began seeing physician's assistant David Padgett at the Marshall Clinic Effingham in April 2010. (Tr. 420-21). Plaintiff saw Mr. Padgett over fifteen times from 2010 until 2012 for treatment involving his legs, sinus infections, back pain, B12 deficiency, depression, anxiety, and a heart murmur. (Tr. 349-428, 468-78, 505-61). Mr. Padgett regularly changed plaintiff's medications and referred him to specialists for treatment. (*Ex.*, Tr. 358-59, 361-63, 389-91, 406-07, 410-11). His assessments of plaintiff's impairments usually stated that plaintiff had a B12 deficiency, depression, anxiety, low back pain, and numbness in his legs. (Tr. 361, 372, 403, 406-07, 408-09).

Plaintiff also saw Dr. Douglas Dove in 2010. (Tr. 214-16). Plaintiff was unable to tandem walk and had no deep tendon reflexes in his bilateral upper and lower limbs. The remainder of the neurological examination was normal.

Dr. Dove's impressions were evidence of lower limb paresthesia and ataxia and he ordered additional EMG testing of the lower limbs. (Tr. 214-15). The EMG results were indicative of a left S1 radiculopathy and diffuse generalized peripheral polyneuropathy. (Tr. 215-16).

In December 2010, plaintiff saw pain specialist Dr. Mohamed El-Ansary. (Tr. 256-57). Plaintiff had tenderness in his S1 areas but no sensory defects in his lower extremities and no motor defects. (Tr. 257). Dr. El-Ansary reviewed an MRI of his lumbar spine that showed disc protrusion at L5-S1, somewhat more to the left and his impression was disc protrusion at L5-S1 with radiculopathy. He recommended epidural and trigger point injections. (Tr. 257). Thereafter, plaintiff received at least five injections in 2011. (Tr. 258-63). Plaintiff also attended physical therapy to help with his back and leg pain. (Tr. 289-94; 326-28). He met his physical therapy goals and reported feeling that he had improved. (Tr. 292, 294). He still had pain, but had no new symptoms. (Tr. 293).

### 4. Consultative Examinations

In June 2012, plaintiff underwent a mental consultative examination with clinical psychologist Jerry Boyd, Ph.D. (Tr. 430-34). Plaintiff was very agitated during the exam but was alert and correctly oriented times four. (Tr. 431). Dr. Boyd opined that plaintiff's attention, concentration, and short-term memory showed significant impairment. (Tr. 431-32). He felt plaintiff could follow simple, repetitive instructions but would have reduced persistence due to his physical impairments. (Tr. 433).

Plaintiff also underwent a physical consultative examination with Dr. Vittal Chapa in June 2012. (Tr. 437-39). Plaintiff informed Dr. Chapa that he stopped working in 2010 due to health problems. Plaintiff reported a history of bilateral carpal tunnel surgeries, left shoulder rotator cuff surgery, and gallbladder surgery. (Tr. 437). Plaintiff's knee reflexes were 1+ bilaterally, ankle reflexes were 2+ bilaterally, and his peripheral pulses were 3+ bilaterally. (Tr. 438). Dr. Chapa noted that plaintiff could perform manipulations with his hands, he had a full range of motion in his joints, he had no edema, and there was no specific motor weakness or atrophy. (Tr. 438-39). On examination, plaintiff could get on and off the exam table, walk on his toe, and walk on his heels. He had difficulty tandem walking and was unable to squat and arise. (Tr. 441). Dr. Chapa's diagnostic impressions were peripheral neuropathy and multiple musculoskeletal pains. (Tr. 439).

### 5. RFC Assessment

State agency physician Henry Rohs, M.D. assessed plaintiff's physical RFC in June 2012. (Tr. 457-63). He reviewed medical records but did not examine plaintiff. He believed plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. He opined plaintiff could stand, walk, or sit for a total of six hours in an eight hour workday. (Tr. 457). Plaintiff was limited to never climbing ladders, ropes, and scaffolds but could perform all other postural activities frequently. (Tr. 458). Plaintiff should avoid concentrated exposure of hazards such as machinery and heights due to his neuropathy. (Tr. 460).

### 6. Opinions of Treating Physician's Assistant

Mr. Padgett assessed plaintiff's work-related limitations on three separate occasions. (Tr. 366-67, 468-74, 505-07). Mr. Padgett's first assessment was completed in August 2011. Mr. Padgett indicated that plaintiff was restricted from any prolonged sitting, standing, or lifting. (Tr. 366). Mr. Padgett also stated that plaintiff had severe limitations in his functional physical capacities and that he was incapable of minimal sedentary activity. He indicated that plaintiff could never perform the work of any occupation and he did not expect plaintiff to have any significant improvement in the future. (Tr. 367).

Mr. Padgett's second opinion was dated December 27, 2012. He felt plaintiff could sit for two hours in an eight hour workday, sit and stand for one hour in an eight hour workday, and plaintiff would need to alternate positions sometimes as often as every fifteen minutes. He felt plaintiff could use his hands for repetitive actions but could not use his feet in operating foot controls. (Tr. 470). Mr. Padgett stated that plaintiff could occasionally lift up to twenty pounds but never anything heavier and plaintiff could occasionally carry up to ten pounds. Plaintiff could never crawl or climb, occasionally bend or squat, and could frequently reach above shoulder level. (Tr. 471).

Mr. Padgett opined that plaintiff could never be around unprotected heights or machinery, plaintiff could drive automotive equipment with moderate restrictions, and plaintiff had no restrictions regarding exposure to marked changes in temperature, humidity, and exposure to dust, fumes, and gases. (Tr. 472). Mr. Padgett opined that plaintiff was not a malingerer but suffered

from severe pain that interfered with his sleep and activities of daily living. (Tr. 473). He also indicated plaintiff had spinal impairments that were manifested by chronic pain and weakness and resulted in the inability to ambulate effectively. The form he completed regarding plaintiff's spinal impairments indicated plaintiff met the requirements for disability under Listing 1.04. (Tr. 468-69).

Mr. Padgett's final opinion indicated plaintiff could sit, stand, or walk for two hours each in an eight hour day. (Tr. 505). Plaintiff could not use his feet for repetitive movements with foot controls. Plaintiff was limited to frequently lifting and carrying less than ten pounds and occasionally lifting and carrying up to fifty pounds. He could never bend or climb and occasionally squat, crawl, and reach above shoulder level. (Tr. 506).

## Analysis

Plaintiff's only argument is that the ALJ improperly weighed the medical evidence and, as a result, improperly formed plaintiff's RFC assessment.

A treating physician's medical opinion is entitled to controlling weight only where it is supported by medical evidence and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).** The version of 20 C.F.R. §404.1527(c)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained

>from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

It must be noted that, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." **Books v. Chater, 91 F.3d 972, 979** (7th Cir. 1996)(internal citation omitted). It is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. **See, 20 C.F.R. §404.1527(d).** In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." ***Schaaf v. Astrue,*** **602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).**

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record. ***Henke v. Astrue,* 498 Fed.Appx. 636, 639 (7th Cir. 2012); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007).** In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has

characterized as "lax." ***Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008);  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).**

ALJ Mackowiak met and exceeded this "lax" standard. First, the ALJ noted that Mr. Padgett was not an acceptable medical source under 20 C.F.R. §404.1513. Mr. Padgett's opinions, therefore, could not establish the presence of a medically determinable impairment. SSR 06-3p. Plaintiff argues that under SSR 06-03p Mr. Padgett's opinions must be weighed using the same factors as an acceptable medical source. However, as the Commissioner cites, SSR 06-03p actually states:

> Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources" . . . Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case.

Therefore, as the Commissioner notes, the ALJ was not *required* to apply all the factors when evaluating Mr. Padgett's opinions. Further, even if Mr. Padgett had been an acceptable medical source, the Seventh Circuit has held that the ALJ has not erred when discussing only two of the relevant factors in 20 C.F.R. § 404.1527(c). ***Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008).** Here, ALJ Mackowiak evaluated enough of the factors in discounting the opinions to make his analysis adequate.

The ALJ stated that he discounted Mr. Padgett's opinions because they conflicted with each other and contradicted Mr. Padgett's opinion relating to Listing 1.04. (Tr. 27). Plaintiff attempts to show that Mr. Padgett's opinions

15

were supported by citing MRI, EMG, and x-ray test results, as well as medical notes that indicate plaintiff had an abnormal gait, tenderness in his spine, and difficulty finding a cure for his pain.

However, as the Commissioner notes, plaintiff does not acknowledge that the ALJ discussed all of the test results he refers to as well as plaintiff's difficulties walking, reports of pain, and epidural injections. (Tr. 24-25). The test results displayed mild disc bulge, radiculopathy, generalized peripheral polyneuropathy, and calcaneal spurs in plaintiff's feet. (Tr. 207, 215, 217, 224-25, 262, 554). Plaintiff does not explain how these results substantiate Mr. Padgett's conflicting reports or restrictive findings and his argument on this point is ineffective.

The ALJ also reasoned that Mr. Padgett's opinions were apparently based on plaintiff's subjective complaints rather than objective evidence. (Tr. 27). Plaintiff contends that the ALJ did not clearly find that Mr. Padgett relied upon plaintiff's subjective complaints because the ALJ used the phrase "appeared to." Since the rest of the objective record does not support the extreme limitations found within Mr. Padgett's opinions, it is reasonable for the ALJ to assume Mr. Padgett's opinions were formed on plaintiff's subjective complaints. ***See, Burton v. Barnhart*, 203 F. App'x 737, 742 (7th Cir. 2006); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).**

On the converse, plaintiff argues that if Mr. Padgett relied on plaintiff's subjective complaints then he relied upon them the appropriate amount. He cites portions of the record where he had subjective complaints of pain.

16

However, as the Commissioner notes, plaintiff does not challenge the ALJ's finding that plaintiff's statements of pain and limiting effects of his symptoms were not fully credible. As a result, plaintiff waives this argument. ***See***, ***Thompson v. Colvin*, 575 F. App'x 668, 675 (7th Cir. 2014).** Since the ALJ found plaintiff's complaints not entirely credible, it follows that Mr. Padgett's opinions that were seemingly based upon those complaints were also not credible.

Plaintiff also takes issue with the fact that the ALJ stated Mr. Padgett's second opinion was from 2011 when it was actually from 2012. While the ALJ did state the incorrect date, he does not state that he places any weight on the timing of the opinions. The ALJ does not conclude that the opinions are discounted because of the dates, and he has supported his rationale appropriately. Therefore, since the Court "can predict with great confidence what the result on remand will be[]" if the case were to be remanded based upon the ALJ's error in dates, his mistake equates to nothing more than a harmless error. ***McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011)**.

Plaintiff contends that Dr. Chapa's assessment of plaintiff took place halfway between Mr. Padgett's opinions and substantiates his opinions. However, Dr. Chapa did not find plaintiff to be disabled in any way. The only portion of Dr. Chapa's assessment that coincides with Mr. Padgett's opinions is that plaintiff was unable to tandem walk and unable to squat and arise. (Tr. 441). Plaintiff fails to account for the rest of Dr. Chapa's assessment where he stated plaintiff had normal gait, no edema, no motor weaknesses, no muscle

17

atrophy, full range of motion in his joints, and normal strength. (Tr. 438-39). These findings do not support the extreme limitations found in Mr. Padgett's opinions, and plaintiff's argument on this point is unavailing.

Plaintiff states that the ALJ's rejection of Mr. Padgett's opinions resulted in an RFC assessment that did not account for all of plaintiff's impairments. Plaintiff does not clarify what additional limitations should have been included within the RFC assessment. He also fails to demonstrate how the ALJ's evaluation was unreasonable. In sum, none of plaintiff's arguments are persuasive. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. **Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012)**; **Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).** ALJ Mackowiak decision is supported by substantial evidence, and so must be affirmed.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Mackowiak committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Stanley W. Roe's application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

IT IS SO ORDRED.

DATE: June 30, 2016.

**s/ Clifford J. Proud**

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**
